FILED
2018 Sep-21 PM 03:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

| | | |
|---|---|---|
| K.W., *as mother and next friend of J.W., a minor,* | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | 7:17-cv-01243-LSC |
| TUSCALOOSA COUNTY SCHOOL SYSTEM | ) ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OF OPINION

Plaintiff, K.W. ("Plaintiff") filed this action, as mother and next friend of J.W., against the Tuscaloosa County School System ("TCSS") appealing a due process decision arising from a hearing conducted under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* ("IDEA"). Before the Court are Defendant's Motion for Summary Judgment (doc. 13) and Plaintiff's Motion for Summary Judgment (doc. 15). For the reasons discussed below, Plaintiff's Motion for Summary Judgment (doc. 15) is denied, and Defendant's Motion for Summary Judgment (doc. 13) is granted.

## I. Background

### a. Factual Background

J.W. is a student at Taylorville Primary School ("TPS"), which is in TCSS. In August 2015, Plaintiff enrolled her son at TPS. During enrollment, K.W. completed a Health Assessment Report. Although K.W. asserts that J.W. has suffered from seizures since he was two (2) years old, she indicated that J.W. had no health, behavioral, or psychological problems on his Health Assessment Report.

However, J.W. began to experience difficulty focusing, hyperactivity, fidgeting and an inability to stay in his seat, and difficulties with completing work during his first grade year. In addition, J.W.'s initial STAR reading and DIBELS assessment scores indicated a reading deficiency. In response, both J.W.'s teacher Ms. Lewis and the school's reading intervention specialist Ms. Henderson began interventions to address the issues. These interventions included one-on-one and small group time with Ms. Henderson as well as Ms. Lewis seating J.W. near her and away from high traffic areas. K.W. was informed that J.W. was receiving additional support by both Ms. Lewis and Ms. Henderson.

In October 2015, Ms. Lewis and Ms. Henderson referred J.W. to the TPS Problem Solving Team (PST) because they believed he would benefit from additional interventions. TCSS's Response to Intervention (RIT) strategy

guidelines provide for the PST to set goals for a child and track their progress. If the child stops making progress, then a referral for special education is made. The PST's initial meeting was held later in October of 2015. During this meeting, the PST discussed J.W.'s reading and behavior and determined that J.W. would benefit from additional support in the classroom through additional one on one or small group instruction. It is disputed whether or not K.W. mentioned at this time that she was taking J.W. to be tested for Attention Deficit Hyperactivity Disorder ("ADHD"). J.W. continued to respond to the interventions provided by Ms. Henderson and Ms. Smith.

In November of 2015, the PST and K.W. met again. At this meeting, the team discussed J.W.'s progress and future goals. K.W. was then given documents advising her that she could contact the TPS's reading specialist if she desired J.W. to be evaluated for a Section 504 or Special Education plan. K.W. did not request the evaluation for J.W. The school continued to apprise K.W. of her son's progress, and the PST met monthly to discuss and review J.W.'s progress through the school's tiered intervention process. The PST involved in J.W.'s education continued to see progress and did not see a need for special education testing.

In March 2016, the PST received a report from J.W.'s pediatrician stating that J.W. had ADHD. J.W.'s pediatrician prescribed Focalin to treat the ADHD

and recommended that K.W. have J.W. evaluated for a 504 Plan or an Individualized Education Program ("IEP"). Around the same time, the school's principal sent K.W. a letter indicating that the school was considering retaining J.W. in the first grade. Though the PST was seeing progress from the interventions, J.W. was not on pace to advance to second grade by the end of the school year.

In light of these circumstances, the PST and K.W. discussed both the Doctor's recommendation and J.W.'s possible retention in first grade during the March 2016 PST meeting. During this meeting, the PST discussed several options to address J.W.'s deficiencies, including testing J.W. for special education, implementing a 504 Plan, and retaining J.W. in his current grade. The school counselor Ms. Guffey, who was also a member of J.W.'s PST, asked K.W. if she wanted J.W. tested for special education, and she declined. Several days later K.W. contacted Ms. Guffey both through a note and a telephone call to tell her that she wanted a 504 plan but not special education services for J.W. Thus, in April of 2016 the school began the referral process for a 504 plan pursuant to K.W.'s request. However, before a meeting could be held to adopt the 504 plan, K.W. filed a due process complaint with the Alabama State Department of Education in May 2016.

In July 2016, K.W. and her attorney attended a special education referral

meeting regarding J.W. with the school's IEP team. The IEP team accepted the referral and at the eligibility meeting held the following month the IEP team considered J.W.'s eligibility under the criteria for Specific Learning Disability (SLD) and Other Health Impairment (OHI) generally and under the ADD/ADHD category. The team considered all the required criteria under these areas, including an IQ test, achievement, reading, math, oral language, RTI activities and progress, work samples, observations, behavioral rating scales, and medical documentation on both J.W.'s ADHD diagnosis and suspected seizures. Testing by the school determined that J.W. did not meet the eligibility requirements for services under IDEA because he did not meet the criteria areas of his suspected disability under the Alabama Administrative Code.

K.W. disagreed with the IEP teams findings and requested that J.W. undergo an Independent Education Evaluation ("IEE") administered by Dr. Joseph Ackerson. Dr. Ackerson preformed his IEE and provided his report to the school in January 2017. The IEE stated that J.W. suffered from "slow cognitive tempo" related to his ADHD. The school system accepted the report and considered it, including the recommendation that school system perform a speech and language evaluation.

In February 2017, the IEP team met again and accepted a second referral on

J.W.. K.W. consented to additional evaluations and the school also considered the report and recommendation from the IEE performed by Dr. Ackerson. This second round of testing additionally included a strengths and weaknesses analysis that was specifically requested by K.W.'s attorney. The IEP team found J.W.'s results were within the normal range, and determined that he was not eligible for special education under categories of SLD, OHI (with or without ADD/ADHD) or Speech and Language Impairment.

### B. Procedural History

In filing the complaint for due process, K.W. sought the following relief: (1) for the school to identify J.W. in all areas of suspected disability, (2) provide for an independent educational evaluation of J.W. , and (3) the development of an IEP for J.W. with provision of additional intervention services.

During the due process hearing, K.W. testified as to the procedural violations she believed TCSS committed in denying J.W. a FAPE. These violations included a (1) failure to test J.W. for ADHD when she allegedly told the PST about getting J.W. tested for ADHD in October, (2) initially discouraging her from having J.W. tested for special education eligibility, (3) her belief that J.W. needs an IEP to be successful in school, and (4) the school's failure to adopt the report and

recommendation from Dr. Ackerson's IEE. The hearing lasted two days, with K.W. and the relevant teachers and employees testifying.

In the opinion's findings, the Hearing Officer determined that TPS did not deprive J.W. of a FAPE by (1) failing to comply with IDEA's Child Find provisions or (2) not adopting Dr. Ackerson's report and recommendations. K.W. appealed the decision, resulting in the current action.

**II. Standard of Review**

The "principal purpose of the [IDEA] is 'to assure that all children with disabilities have available to them . . . a free and appropriate public education ["FAPE"] which emphasizes special education and related services designed to meet the handicapped child's unique needs, . . . [and to ensure] that the rights of handicapped children and their parents or guardians are protected." *N.B. v. Alachua County Sch. Bd.*, 84 F.3d 1376, 1378 (11th Cir. 1996) (quoting 20 U.S.C. § 1400(c)). In order to "carry out these objectives, the IDEA provides procedural safeguards." *Id.* (citing *Honig v. Doe*, 484 U.S. 305, 311–12 (1988)). One of these procedural safeguards is the "opportunity for an 'impartial due process hearing.'" *Id.* IDEA provides that "any party who is 'aggrieved' by an administrative decision 'shall have the right to bring a civil action . . . in any State court of competent jurisdiction or in a district court of the United States without regard to

the amount in controversy.'" *Jefferson Cty. Bd. of Educ. v. Lolita S.*, 977 F. Supp. 2d 1091, 1109 (N.D. Ala. 2013), *aff'd*, 581 F. App'x 760 (11th Cir. 2014) (quoting 20 U.S.C. § 1415(i)(2)(A)).

"[T]he IDEA provision for judicial review has been described as 'puzzling' and 'somewhat confusing.'" *Walker Cnty. Sch. Dist. v. Bennett ex rel. Bennett*, 203 F.3d 1293, 1297 (11th Cir. 2000) (citing *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995); *Jefferson Cnty. Bd. of Ed. v. Ala. Dep't of Ed.*, 853 F.2d 853, 856 (11th Cir. 1988)). Once an IDEA case is before the district court, the "usual F.R. Civ. P. 56 summary judgment principles do not apply." *Loren v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309, 1313 (11th Cir. 2003). Instead, summary judgment serves as "a procedural vehicle requiring [the district judge] to decide . . . [the IDEA] action on the basis of the administrative record." *Id.* at 1313 n.4 (quoting *Suzawith v. Green Bay Area Sch. Dist.*, 132 F. Supp. 2d 718, 724 (E.D. Wis. 2000)).

The Eleventh Circuit has emphasized that courts "owe some judicial deference to local administrative agency judgments." *Loren*, 349 F.3d at 1314 n.5 (citing *Deal v. Hamilton County Dept. of Educ.*, 259 F. Supp. 2d 687, 691– 92 (E.D. Tenn. 2003)). Therefore, the district court may not "substitute its own judgment on sound educational policy for those made at the state administrative level."

*Jefferson Cty. Bd. of Educ. v. Breen*, 853 F.2d 853, 856 (11th Cir. 1988) (citing *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982)). This is particularly true when matters call for educational expertise. *Loren,* 349 F.3d at 1314 n.5.

"[T]he role of the district court is simply to 'review the administrative determinations.'" *Breen*, 853 F.2d at 857 (quoting *Manecke v. School Bd.*, 762 F.2d 912, 919 (11th Cir. 1985) (emphasis in original), *cert. denied*, 474 U.S. 1062 (1986)). Therefore, administrative findings of fact "are considered to be prima facie correct." *Loren,* 349 F.3d at 1314 n.5. If a reviewing court fails to adhere to administrative findings of fact, "it is obliged to explain why." *Id*. However, the "extent of deference to be given the administrative findings of fact," nonetheless remains "an issue left to the discretion of the district court." *Breen*, 853 F.2d at 857. Similarly, "the extent of deference to be given to the administrative decision is left to the sound discretion of the district court, which must consider the administrative findings but is free to accept or reject them." *Walker County Sch. Dist v. Bennett*, 203 F.3d 1293, 1297–98 (11th Cir. 2000). Reviewing courts must base their decisions on the preponderance of the evidence and give "due weight" to administrative findings of fact. *Rowley*, 458 U.S. at 206.

### III. Discussion

K.W. alleges that the Hearing Officer erred in finding that TPS (1) complied with IDEA's Child Find requirements, and (2) that it did not act improperly by failing to adopt the recommendations in Dr. Ackerson's IEE.

### A. Child Find

IDEA provides federal funding to the states in exchange for their commitment to provide "children with disabilities" a FAPE. *Durbrow v. Cobb Cty. Sch. Dist.*, 887 F.3d 1182, 1189 (11th Cir. 2018) (quoting 20 U.S.C. § 1400(d)(1)(A)). As a condition of funding, IDEA imposes an affirmative obligation on state educational authorities to identify, locate, and evaluate "children with disabilities…who are in need of special education and related services"—a process known as "Child Find." *Id.* § 1412(a)(3)(A); Ala. Admin. Code §290-8-9-.01-(1)(a). "Evaluations are only required when the evidence is sufficient to cause a school system to have a reasonable belief that such an evaluation is necessary." *Lolita S.*, 977 F. Supp.2d at 1124. If the school system makes a finding that the child (1) has a qualifying disability and (2) needs special education services because of that disability, it must form and implement an IEP through a cooperative process with the child's parents. *Id.* § 1414(a)–(c).

Here, the Hearing Officer correctly found that TPS did not violate its Child Find obligations because (1) the school properly followed the Child Find process under Alabama's Administrative Code and (2) the school complied with its Child Find obligations within a reasonable time of K.W.'s request for an evaluation. The Court is not in a position to second guess the expertise of the professional educators and school officials or set educational policy. Therefore, the Court will not find the school in violation of its Child-Find obligations unless it overlooked "clear signs of disability" or "negligently failed to order testing." *Durbrow*, 887 F.3d at 1196 (quoting *Clay T. v Walton Cty. Sch. Dist.*, 952 F. Supp. 817, 823 (M.D. Ga. 1997)).

The Hearing Officer's findings and the uncontroverted record shows that the school neither overlooked clear signs of a qualifying disability nor negligently failed to order testing. Although J.W. was later diagnosed with ADHD, TPS complied with Alabama's Administrative Code by first implementing intervention strategies for J.W. through the PST. Alabama's regulations implementing IDEA's Child Find requirements state that "[b]efore a child is referred for special education evaluation or concurrently during the evaluation process, intervention strategies must be implemented in the general education program and monitored by a Problem Solving Team (PST) for an appropriate period of time (a minimum of

eight weeks) and *be determined unsuccessful*." Ala. Admin. Code § 290-8-9-.01(4) (emphasis added).

> A student is [] unlikely to need special education if [] (1) the student meets academic standards; (2) teachers do not recommend special education for the student; (3) the student does not exhibit unusual or alarming conduct warranting special education; and (4) the student demonstrates the capacity to comprehend course material. *Durbrow*, 887 F.3d at 1193-94 (citing *Alvin Indep. Sch. Dist. V Patricia F.*, 503 F.3d 378, 383 (5th Cir. 2007)).

Here, the Hearing Officer found, and the administrative record supports his conclusion, that J.W. was in fact responding to the interventions provided by his teacher and the school's reading intervention specialist. Moreover, the record indicates that both J.W.'s teacher and the reading specialist working with him did not think the interventions were unsuccessful or that J.W.'s progress had stalled and special education services were warranted. Although Ms. Lewis was concerned about J.W.'s behavior, the record indicates that she did not consider his behavior alarming or even grounds for a disciplinary referral.

In fact, the record indicates that the interventions were first alleged to be unsuccessful in March of 2016, when K.W. became concerned that J.W. may be retained in the first grade. At the March PST meeting, K.W. expressed her concerns about J.W's progress and the PST discussed her options. However, the uncontroverted record again suggests that neither the PST, nor K.W. thought that

J.W. needed special education services at that time. In fact, K.W. communicated on this occasion and others that she wanted the 504 plan, not "Special Ed" for her son. A medical diagnosis of ADHD alone does not, in-and-of itself, bring a student within the ambit of IDEA and the undisputed record indicates that the school found and currently does not believe that J.W. is in need of special education services, even after completing two full evaluations.

Although the initial PST evaluation period under the Alabama Administrative Code may be waived "for a child who has been referred by his or her parents" for evaluation, the record does not indicate that K.W. referred her child for evaluation before initiating her due process complaint. Therefore, the record supports the Hearing Officers' conclusion that the school completed a timely evaluation once K.W. requested one. Initially, K.W. did not disclose any medical or behavioral issues on J.W.'s enrollment questionnaire. Moreover, the record indicates that K.W. is the only person at the October 2015 PST meeting that remembers her letting the school know that J.W. was getting tested for ADHD. However, testing for ADHD alone does not indicate that a child needs to be evaluated for special education services. J.W. had and continued to progress through the PST process, and because these efforts were continuing to be successful a special education evaluation and referral was not necessary.

When K.W. subsequently requested a special education referral and filed a due process complaint, the school honored her request and commenced the testing of the child. Although K.W. ultimately disagreed with the results, the record indicates that upon her request, the school initiated extensive testing in which K.W. was in -fact involved. The school also conducted additional analyses beyond those required at the request of K.W.'s attorney and paid for K.W. to have an Independent Educational Evaluation ("IEE") by Dr. Ackerson when she requested that J.W. be retested. Ultimately, the record shows that after extensive evaluation pursuant to its Child Find obligations TPS's faculty and administrators did not identify a qualifying disability. "IDEA does not penalize school districts for not timely evaluating students who do not need special education." *D.G. v Flour Bluff Indep. School Dist.*, 481 Fed. Appx. 887, 893 (11th Cir. 2012). Therefore, TPS was not required to place J.W. in special education nor evaluate him for special education services simply because of his ADHD diagnosis. Accordingly, the hearing officer correctly found that the school complied with its Child Find obligation.

B. **Disability Determination & Consideration of the IEE**

It is undisputed that J.W. has ADHD, which can be a qualifying disability under IDEA and Alabama's Administrative Code as an Other Health Impairment

("OHI"). 34 C.F.R. § 300.8(c)(9)(i); Ala. Admin. Code §290-8-9-.03(9). However, the Hearing Officer found that there was insufficient evidence in the record to demonstrate that J.W. had a "disability" under the eligibility criteria in the Alabama Administrative Code.

In determining whether a child is eligible for special education services, the IEP team must evaluate the child in all areas of suspected disability. Ala. Admin. Code § 290-8-9-.02(1)(g). A child is eligible for special education services if the child (1) has a disability that meets eligibility requirements in the code, (2) the disability adversely affects the child's educational performance, and (3) the disability requires specially designed instruction. Ala. Admin. Code §§ 290-8-9-.02, 290-8-9-.03. In order for a student with ADHD to qualify as having an OHI, that child's "standard scores (total or composite) on two out of three of the same norm referenced scale designed specifically to determine the presence of ADD or ADHD must be at least two standard deviations above or below the mean (70, depending on the rating scale)." Ala. Admin. Code § 290-8-9-.03-(9).

Here, the record supports the hearing officer's determination that J.W.'s ADHD did not qualify as a disability for the purpose of IDEA. The record indicates that J.W.'s behavior was within the acceptable range during his initial and subsequent evaluations. Moreover, J.W.'s teachers indicated that despite J.W.'s

ADHD, J.W. was able to access the general education curriculum and continued to make progress through intervention, albeit not at a level that K.W. deemed acceptable. Tellingly, the only change in the scoring and rating of J.W.'s behavior during the second round of evaluations occurred in K.W.'s rating of J.W..

However, K.W. alleges that this determination was incorrect and that TPS deprived J.W. of a FAPE because the school failed to adopt the report and recommendation of Dr. Ackerson's IEE, which found that J.W. had a qualifying disability and recommended giving J.W. an IEP under the OHI category. As a procedural safeguard, IDEA provides parents the opportunity to obtain an IEE "at public expense if the parent disagrees with an evaluation obtained by the public agency," 34 C.F.R. § 300.502(b)(1). When a parent obtains such an IEE, the evaluation "[m]ust be considered by the public agency, if it meets agency criteria, in any decision made with respect to the provision of FAPE to the child …" *Id.* § 300.502(c)(1). But, an IEE is not dispositive. In making a determination on a student's eligibility for special education, "a school district must '[d]raw upon information from a variety of sources, including aptitude and achievement tests, parent input, and teacher recommendations . . . .'" *Durbrow*, 887 F.3d at 1193 (quoting 34 C.F.R. § 300.306(c)). "If a student′s parents want him to receive special education under IDEA, they must allow the school itself to reevaluate the

student and they cannot force the school to rely solely on an independent evaluation." *M.T.V. v. DeKalb Cty. Sch. Dist.*, 446 F.3d 1153, 1160 (11th Cir. 2006) (quoting *Andress v. Cleveland Indep. Sch. Dist.,* 64 F.3d 176, 178–79 (5th Cir. 1995)).

Here, the record indicates that Plaintiff was afforded her statutory right to an IEE and another round of evaluations of J.W. was completed. Contrary to K.W.'s assertion, the record does not indicate that Dr. Ackerson's report was disregarded or ignored in J.W.'s overall evaluation for special education eligibility. In fact, the record indicates that TPS reviewed the IEE and ultimately adopted its recommendation that the school system perform speech and language evaluations. Although K.W. disputes these facts in her briefing, the proof on the record indicates otherwise and thus the Hearing Officer's finding will not to be disturbed. Ultimately, Plaintiff is unable to point to evidence that TPS did not consider Dr. Ackerson's report and recommendations other than its failure to adopt its findings. However, the school is not required to adopt the IEE and, thus, did not deprive J.W. of a FAPE when it did not adopt all of Dr. Ackerson's recommendations.

### c. Attorney's Fees

The prevailing party in an IDEA administrative action is entitled to reasonable attorney's fees. *See* 20 U.S.C. § 1415(i)(3)(B)(i)(I); *Mitten By &*

*Through Mitten v. Muscogee Cty. Sch. Dist.*, 877 F.2d 932, 935 (11th Cir.1989). Although the IDEA does not define the term "prevailing party," federal courts typically apply the definition given the term in other federal civil rights statutes. *See Id.* Under this construction, "[o]nly a party who obtains a judgment on the merits or a similar court-ordered change in the parties' legal relationship, such as a consent decree, may be considered a 'prevailing party' for purposes of a fee award." *Loggerhead Turtle v. Cty. Council of Volusia Cty., Fla.*, 307 F.3d 1318, 1323–24 (11th Cir. 2002) (footnote omitted) (quoting *Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Human Res.*, 532 U.S. 598, 603–604 (2001)). In order to be considered a prevailing party, the party must succeed "on any significant issue in litigation which achieves some benefit sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).

Plaintiff has offered no specific facts supporting her assertion that she is the prevailing party, and as such, is not due to receive attorney's fees. K.W. claims that she succeeded on a significant issue in the case but gives no further explanation. While TPS did evaluate J.W., provide for an IEE, and perform additional IEP evaluations as requested in the original due process complaint, the hearing officer found for the Defendant. Any benefit achieved was not a result of a substantive legal judgment. Thus, under the *Buckhannon* standard—or virtually any other

construction of the term—Plaintiff is not the "prevailing party." Therefore, Plaintiff will not receive attorney's fees.

## VI.  CONCLUSION

For the reasons stated above, K.W.'s Motion for Summary Judgment (doc. 15) is due to be DENIED, and TCSS's Motion for Summary Judgment (doc. 13) is due to be GRANTED. The Hearing Officer's findings and determinations challenged by Plaintiff are due to be AFFIRMED.

Motion for Summary Judgment (doc. 13) is due to be granted.

Motion for Summary Judgment (doc. 15) is due to be denied.

An order consistent with this opinion will be entered contemporaneously herewith.

**DONE** and **ORDERED** on September 21, 2018.

L. Scott Coogler
United States District Judge

195126